Good morning, ladies and gentlemen. First case on the oral argument calendar today is United States v. Taylor. Good morning, Your Honors. My name is Tara Allen. On behalf of Mr. Taylor, I intend to reserve three minutes for rebuttal. May it please the Court. Mr. Taylor was convicted of being a prohibited possessor of firearms and ammo found in the family home. This case presents the tension that occurs when you have a lawful possessor of firearms who lives with a prohibited possessor. Luckily, there is a lot of law on this area. This case falls squarely within this Court's jurisprudence on what constitutes constructive possession when the premises are jointly occupied. In such cases, the law provides that proximity, access, knowledge, and even close relationship with the possessor are not enough. Rather, the law requires proof of a substantial connection between the defendant or the prohibited possessor and the firearms which were found. That did not occur in this case. All of the firearms and ammunitions were found among Mia Taylor's belongings. She was clearly a gun enthusiast. Did you say found amongst her belongings or amongst like mixed belongings? Among her belongings, Your Honor. You mean none of his belongings were mixed in with hers? That's correct. So what happened was there were four areas where evidence was found. In the master bedroom closet, which was a walk-in closet, there was testimony that all of Mia's belongings were on the left side of the closet and all of Mr. Taylor's were on the right side. All of the evidence in that closet was found on the right side among Mia's possessions. There were three empty gun cases that were placed in the middle of the closet and there were photos taken of them on the floor. The photos were taken from different angles. The one showed to the jury was from an angle in which you could see men's shoes, but those shoes were on the right side of the closet. The empty gun cases were placed on the floor for photographs. And as the court might recall, a number of the items were moved prior to photographing. The second place where guns and ammunition were found was in the master bathroom closet. That closet also was divided between women's items and men's items, only opposite. The right side of that closet was Mia's belongings and the left side were Mr. Taylor's belongings. Everything found in that closet was found among Mia's belongings. There was a women's Nike shoe box that contained gun parts and ammos. There was a small safe which the evidence said was found in the middle of the closet and it was closed, but not locked. Inside the safe were ammunitions and firearms. And it was marked King, right? No, there was a hat marked King. A hat marked King. That was in the bedroom on the dresser by where the iPhone was found. The bedroom was jointly occupied by both Mr. Taylor and Mia Taylor. The third area where guns and ammunitions were found was the office outside the master bedroom, which indicated that that was Mia firearms was found. Also going back to the master bathroom closet, that's where the concealed weapons permit for Mia Taylor was found, along with her registration for a gun training class at Shooter's World. Everything indicating that she was a gun enthusiast and that these were her weapons. And then the fourth area where some guns were found were in a closet in the west upstairs bedroom that contained women's clothes and hats and those were found in a suitcase. The only items of Mr. Taylor's that were found during the search were the Bank of America debit card and envelope that were found in the shared bathroom closet, but on the right side among his belongings. They were later moved and put into the Nike women's shoe box and brought downstairs to be photographed. Agent Staub testified to that and Agent Montgomery confirmed it. There was the defendant's driver's license was found in a drawer, but that wasn't anywhere near any firearms and ammo as well. So in order to prove when you have joint occupancy and to prove constructive possession, the courts say that the items can belong to either of the parties or both of the parties and speculation isn't enough to figure out who they belong to. And that is why the courts require some kind of a substantial connection between the defendant and the firearms that were found. Now that substantial connection in this case, I can only assume that the government is relying on the text messages to Trowel that were found on the defendant's phone. Now that phone was also jointly possessed by both parties. That was the phone number that Mia gave the Sierra Auctions people. There's no evidence to that. Agent Sonnendecker, who did the forensics on the phone, said there was no way to tell which user of the phone sent the text. And when Mia bought some of the firearms, she used that phone number on the receipt. There's nothing to say that she didn't take a photo of those guns and had the phone with her when she bought them. There's just simply not enough evidence to show that he's the one that sent those texts to Trowel versus Mia having done it. Not to mention that the texts were sent in August and the indictment charges this prohibitive possession to have occurred in November, which was during the search. Unless the court has any other questions about the other two issues, I can reserve. Okay. Very good. Thank you. Good morning. May it please the Court. Rachel Hernandez on behalf of the United States. Six firearms and hundreds of rounds of ammunition were found unsecured in defendant's bedroom closet and bathroom closet, mingled among his clothes, his mail, and a credit card. The text messages show that shortly after his wife acquired some of the guns, he sent messages attempting to sell the guns. Construing the evidence in the light most favorable to the government, the conviction of this three-time felon was supported by more than sufficient evidence. The question on sufficiency is whether he had the intent to possess these weapons. The defendant conceded in his opening brief that he had the knowledge and the power. That's at page 28 of his opening brief. Sitting at home, he had access but not intent. The intent here can be shown in several ways. First of all, just the sheer volume of the hundreds of rounds of ammunition found in bags, found loose, sitting on a shelf. The bathroom closet is a closet with sliding doors and shelves. The testimony was that the items in the bathroom closet belonged to men and women. Items commonly used, band-aids, things like that. And in that area, weapons were found and ammunition was found. Specifically in the bathroom closet, there was testimony that close to the visa card and the mail, all of the guns and ammunition in that closet could be reached from where the card was to where the weapons were. So just the sheer volume, the haphazard storage of them, the shotgun in the master bedroom closet leaning up against the wall, immediately accessible upon walking into the closet, nylon gun cases strewn on the floor. Is your opponent correct when she says that all of the guns were found on, I'll call it, the woman's side of the closet? I don't believe the evidence supports that claim, no, Your Honor. As I said, the shotgun was in plain view leaning against the wall. Where was it? Was it on the woman's side or the man's side? I don't think the evidence was clear on that. We don't dispute that they shared the closet, but that puts this case on par with the Terry case in which the gun was found in the defendant's shared closet with his wife. And the way these guns were stored and the way the ammunition was throughout the house, there can really be no question that he intended to possess them as well. When you combine that with the text messages sent from a phone that subscriber records show was his, that a bill shows was his, that text messages were signed by Tony, which is his nickname, that he received text messages that said, bro, let me swap the guns. Bro is typically not going to be sent to his wife. There's absolutely, other than his mom's assertion that the wife and the husband shared the phone, there's no evidence that they shared the phone. And that really doesn't comport with how we know people use iPhones. They don't share them. Close in time to these messages, the defendant was sending text messages to other women, which would indicate again that his wife wasn't using the phone. It was found charging next to a hat, a man's hat. So when you combine the permissibly admitted cell phone evidence and the manner in which these weapons and ammunition were stored in the home, it's clear the defendant had the intent to possess them. Counsel, can I just direct you to the applicability of the Supreme Court's recent decision in Rahafe? Yes, Your Honor. What was the government required to prove under Rahafe? Under Rahafe, Rahafe added the element requiring that the defendant knew that he was a felon at the time. A felon or a prohibited possessor? A prohibited possessor. And in this case, it's one and the same. And the government filed a 28-J letter on this. And this case is similar to the court's decision in Benamor in which plain error was found. This issue was not raised before the district court. But it did not, the third element of plain error could not be met because it did not affect Benamor's substantial rights because he stipulated that he had a prior conviction punishable by more than a year, as did the defendant here. Also in Benamor, the court found that nothing would change because he had, I think in that case, six convictions. Here we have three convictions. But the government would urge that this case is similar to Benamor and there was no plain error. So you concede that the government did not prove that Taylor knew he was a prohibited possessor? I would concede that that was not an element that the jury was told to find. The defendant did enter a stipulation saying he understood, he agreed that at the time, the relevant time period, he had a conviction, he had been convicted in the past, excuse me, of a crime carrying a punishment of more than a year. I think that you could infer from that that he knew he had that because he entered the stipulation, but the jury was not instructed that they needed to find it. And to rehave, that would not be sufficient to meet the government's burden of proof. Okay, thank you. If there's no further questions, thank you. The government asks that you affirm. Ms. Allen, before you start on whatever else you're going to argue, are you now raising the contention that rehave applies to your client or to this case? No. All right, thank you. Thank you, Your Honors. In response to the government's arguments, let me ask you this. What else could Mia Taylor have done in this case? If these firearms and ammunitions are hers, as is the case, what else could she have done in the family home where children live other than keep them in her private areas, which are her master bedroom closet, her master bathroom closet, among her own belongings? They were in safes. They were in gun cases. They were somewhere where the children could not get them. It is not her fault that she lives with her husband. All of us have master bedroom closets, usually, and closets we share with our husbands in the garages. I can give you a personal story. My husband is a gun enthusiast. He has every bit as much of this ammunition, if not more, and every bit as many of these guns, if not more. We have four different safes. There is ammunition in the safe that we share. There is a reason why the law provides that you have to prove some kind of substantial connection. And in this case, yes, there is evidence that these things were only found among her belongings, and that his documents that were found were found among his belongings. The haphazard storage that the government alleges is not haphazard. The guns were in cases and in a safe. Their reliance on Terry is completely distinguishable because in Terry, in the master bedroom closet, the gun was found among the men's belongings and next to the men's boots. That is not what happened in this case. As far as the text messages go that were signed Tony, those were messages that had nothing to do with the weapons whatsoever. And notably, all of the text messages to Trel, none of them were signed Tony. As far as there not being any evidence that the phone was jointly used, there certainly was. She used it on the receipt with Sierra Auction, and his mother testified that they use it to FaceTime the kids, which everybody does. There were four phones found in the house. Only one was an iPhone. And Agent Sonnendecker testified that the iPhone is the easiest and easiest to use for taking photos and texts, etc. So there's no surprise that they would both be using the best phone in the house for things that they needed. And in regard to the 404B evidence and the prosecutorial misconduct, I think because the evidence in this case was so weak that that's really what tipped the scale for the jury, was seeing evidence of extramarital relations that had nothing to do with the guns when there was Mr. Taylor used the phone anyway. They already had the texts that were signed Tony. They already had that he was the subscriber and it was shipped to him, and that it was password protected. They didn't need these extramarital relations to show that he was using the phone. And they certainly didn't need to violate the court's order by pointing out to the jury in the first sentence of opening statement that he was a felon. And then again, during the last witness, implying that she bought the guns because he was a felon. The prosecution did that directly against the court's order. And I submit to you that the reason that they did that, as well as lobbied so hard to get the extramarital relations in, was to make Mr. Taylor look bad because they didn't have enough evidence otherwise. So unless the court has any other questions? Thank you, Counsel. Thank you, Your Honor. Thank you both for your arguments this morning. The case just argued will be submitted for decision.
judges: Thomas, Tashima, Wardlaw